HAEGGQUIST & ECK, LLP
AMBER L. ECK (177882)
  ambere@haelaw.com
ALREEN HAEGGQUIST (221858)
  alreenh@haelaw.com
AARON M. OLSEN (259923)
  aarono@haelaw.com
225 Broadway, Suite 2050
San Diego, CA 92101
Telephone: (619) 342-8000
Facsimile: (619) 342-7878

Attorneys for Plaintiff and the Proposed Class

[Additional Counsel Appear on Signature Page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| ROBERT COHEN, a consumer, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CONAGRA BRANDS, INC., a Delaware corporation,<br><br>Defendant. | Case No.: 8:20-cv-00637-DOC-ADS<br><br>CLASS ACTION<br><br>SECOND AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED<br><br>Original Complaint Filed: April 1, 2020<br>Trial date: Not set. |

HAEGGQUIST & ECK, LLP

Plaintiff Robert Cohen ("Plaintiff"), on behalf of the general public, by and through his counsel, brings this action against Conagra Brands, Inc. ("Defendant"), a Delaware corporation. Plaintiff alleges the following upon information and belief, except where such allegations are based upon his own purchases of Defendant's poultry products and his exposure to Defendant's marketing and statements concerning the poultry products that he viewed, heard, or read.

## NATURE OF THE ACTION

1.     Plaintiff – a senior citizen residing in Southern California who has purchased Defendant's poultry products in California – brings this civil action, on behalf of himself and other members of the Class, against Defendant for relief under California's consumer protection laws.

2.     Defendant owns more than 80 food brands, including poultry products offered under Defendant's "Banquet" brand, which it sells nationwide in supermarkets, restaurants, and food service establishments. It has approximately 42 manufacturing facilities and revenue of about $18 billion per year.

3.     Defendant promised consumers, both in advertising and on product packaging, that its Banquet chicken products were "100% Natural" and contained "no preservatives," "no artificial colors," and "no artificial flavors." Contrary to those promises, Defendant's chicken products contained non-natural chemicals and were made from the meat of chickens that were grown and fed with chemical-laced products and whose meat was subjected to various non-natural anti-microbial treatments as part of the slaughtering and butchering process. Defendant's advertising and product packaging are false and misleading in violation of California's consumer protection laws.

4.     The very government regulator who is supposed to be guarding the hen house, namely, the USDA/FSIS, has found that labels such as Defendant's, despite a stamp of approval, may still be false and misleading. The USDA, Office of the

Inspector General ("OIG") investigated its label review process and concluded that inaccurate labels are in commerce.

5.    USDA's June 2020 report, titled *Controls Over Meat, Poultry, and Egg Product Labels*, indicated how unreliable these meat and poultry labels are, even if USDA has approved them:

> As a result, meat, poultry, and egg product labels may reflect inaccurate statements and claims made by establishments. Additionally, there is reduced assurance that establishments' generic labels meet requirements. Based on our sample results, we estimated that approximately 2,038 (15.00 percent) of the approved required labels and 161 (18.34 percent) of the approved generic labels may have one or more exceptions.[1]

6.    Building on USDA's acknowledgement that inaccurate labels are in commerce, four U.S. Senators called on USDA in March 2023 to address misleading meat labels. According to the U.S. Senators, "Without clear labels, consumers are robbed of their ability to purchase in accordance with their values," and "USDA has an obligation to ensure consumers have the information necessary to make informed choices about the products they purchase and that hardworking farmers and producers are able to compete on a level playing field." The Senators asked USDA to "explain how a company is required to substantiate claims in their application."[2]

---

[1]    USDA, Audit Report 24601-0002-23, https://www.usda.gov/sites/default/files/audit-reports/24601-0002-23.pdf, last visited March 28, 2022. This report was not referenced in Plaintiff's April 2020 complaint that was reviewed by the Ninth Circuit in *Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283 (9th Cir. 2021).

[2]    Press release, *Blumenthal, Booker, Warren & Whitehouse Call on USDA to Address Misleading Meat Labels*, available at https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-bookerwarren-

HAEGGQUIST & ECK, LLP

7.      President Biden issued an Executive Order on Promoting Competition, which addressed enforcement actions in the meat industry and addressed meat industry mislabeling to increase transparency for consumers.[3] In turn, in June 2023 USDA launched an effort to strengthen substantiation of animal raising claims.[4] Consumers understand "natural" claims to be an animal raising claim. Secretary Vilsack echoed the U.S. Senators by saying: "Consumers should be able to trust that the label claims they see on products bearing the USDA mark of inspection are truthful and accurate." In a nod back to USDA's own report on inaccurate labels being in commerce, Secretary Vilsack said USDA is taking action ensure the integrity of the labels.

8.      As a poultry manufacturer and seller, Defendant is subject to compliance with the federal Poultry Products Inspection Act ("PPIA"), which was enacted in 1957 to ensure that the nation's poultry products "are wholesome, not adulterated, and properly marked, labeled, and packaged."  21 U.S.C. §451. "Under the PPIA, certain poultry product[] [labels], like the ones in this case, ***must*** be preapproved by a federal agency before the products go to market." *Cohen v. Conagra Brands, Inc.,* 16 F.4th 1283, 1286 (9th Cir. 2021) (emphasis added); *Cohen v. Conagra Brands, Inc.,* Case No. 8:20-cv-00637-DOC-ADS, 2023 U.S. Dist. LEXIS 127656, at *26 (C.D. Cal.

---

and-whitehouse-call-on-usda-to-address-misleading-meat-labels. The Senator's website provides a link to their March 30, 2023 letter to the USDA. The Ninth Circuit in *Cohen v. ConAgra Brands, Inc.,* 16 F.4th 1283 (9th Cir. 2021) did not have the benefit this information from 2023.

[3]      White House Competition Council, available at https://www.whitehouse.gov/competition/, last visited September 1, 2023.

[4]      Press Release, *USDA Launches Effort to Strengthen Substantiation of Animal-Raising Claims*, https://www.usda.gov/media/press-releases/2023/06/14/usda-launches-effort-strengthen-substantiation-animal-raising, last visited September 1, 2023.

HAEGGQUIST & ECK, LLP

July 7, 2023) (finding, "it is unlawful to place products requiring initial sketch approval into commerce without preapproval."); 21 U.S.C. §457(c); 9 C.F.R. §412.2(b), (e).

9.     In violation of the PPIA, Plaintiff is informed and believes Defendant evaded the federal regulatory scheme by unlawfully placing its Popcorn Chicken product into commerce without *first* obtaining preapproval of its label by the federal Food Safety and Inspection Service ("FSIS"). Defendant deceptively placed the product with an unapproved label on supermarket shelves in violation of federal law, while Plaintiff and consumers reasonably believed the poultry product that they purchased was legally compliant. As a result, Defendant has been unjustly enriched with ill-gotten gains from Plaintiff and thousands of consumers who purchased Defendant's Popcorn Chicken product that was unlawfully marketed and sold without FSIS approval in violation of the PPIA.

10.     Similarly, because Defendant unlawfully placed the Popcorn Chicken product on store shelves without preapproval in violation of the PPIA, Defendant fundamentally misinformed consumers and misrepresented the approval, standard, quality, and/or certification of the product, which reasonable consumers believed was necessarily lawfully approved to be on store shelves in the first instance.

11.     Defendant's conduct in disregard of the PPIA violates California's consumer protection statutes, namely, the California Consumers Legal Remedies Act (CLRA), the Unfair Competition Law (UCL), and the False Advertising Law (FAL).

12.     Worse, in addition to the Popcorn Chicken product, several of Defendant's other poultry products were also not honestly presented by Defendant in a way that does not mislead or misinform the consumer. First, the poultry products' *labels* contain deceptive and materially misleading statements, including claims of "100% Natural White Meat Chicken," "No Preservatives," "No Artificial Colors," and "No Artificial Flavors," when in fact the poultry products do not meet a reasonable consumer's expectation of "natural," and the products contain synthetic

HAEGGQUIST & ECK, LLP

ingredients in contradiction of Defendant's representations. Second, aside from its labels, Defendant markets and advertises its poultry products in a false and misleading manner via its *website, circulars, coupons, and other media*, which are outside the federal agency's purview under the PPIA. For example, on its website, Defendant makes a key representation about the poultry products that reads: "They're made with 100% natural, white meat chicken and without preservatives, artificial flavors, or artificial colors" – thereby claiming that the poultry products *as a whole* are made without preservatives, artificial flavors, or artificial colors, which is false and misleading because the products are made with such ingredients. Plaintiff and consumers across the nation, including in California, were misinformed and relied on Defendant's deception to purchase Defendant's poultry products.

13.     Defendant has been unjustly enriched at the expense of Plaintiff and members of the Class and is now required to make restitution to Plaintiff and the Class.

14.     To address the harms he and the proposed members of the Class have suffered, Plaintiff brings this proposed class action lawsuit alleging causes of action for (1) violation of the California Consumers Legal Remedies Act (CLRA), Cal. Civ. Code §1750, *et seq*.; (2) violation of California's Unfair Competition Law (UCL), California Business & Professions Code § 17200, *et seq*.,; (3) violation of California's False Advertising Law (FAL) 17500, *et seq*., and (4) Unjust Enrichment.

**PARTIES**

15.     Plaintiff Robert Cohen is a senior citizen living in Tustin, California. At the time he purchased Defendant's poultry products, Plaintiff relied on Defendant putting into the market legally compliant products and making truthful representations about whether those products were in fact natural and without preservatives, artificial colors, or artificial flavors.

16.     Defendant Conagra Brands, Inc. is a Delaware corporation with its principal place of business located at 222 W. Merchandise Mart Plaza #1300,

1   Chicago, Illinois 60654. At times relevant to this lawsuit, Defendant advertised its

2   Banquet products as "honest, wholesome food, you can trust…."[5] Defendant's

3   products are sold nationwide and its marketing of those products received a

4   nationwide audience, including by use of website marketing, and therefore Defendant

5   used interstate commerce in the marketing, advertising, and sales of its poultry

6   products.

7   **JURISDICTION AND VENUE**

8   17.    This case arises in part under California Bus. & Prof. Code § 17203,

9   which provides that any person who engages, has engaged, or proposes to engage in

10   unfair competition may be enjoined in any court of competent jurisdiction.

11   Defendant's misrepresentations of material fact in its marketing of the poultry

12   products constitute false advertising under California Bus. & Prof. Code § 17500.

13   This Court has subject matter jurisdiction over this action. *See* 28 U.S.C. § 1332.

14   18.    This Court has personal jurisdiction over the parties in this case. Plaintiff

15   lives in Tustin, California which is in Orange County and within the jurisdiction of

16   the Southern Division of the Central District of California. He has purchased

17   Defendant's poultry products at several grocery stores in California, and, by filing

18   this Second Amended Complaint, consents to this Court having personal jurisdiction

19   over him.

20   19.    Defendant, a citizen of Illinois due to its principal place of business being

21   in Chicago, Illinois, and incorporated in Delaware, is authorized to, and in fact does,

22   conduct substantial business in California, including the Central District of California.

23   Defendant purposefully avails itself of the laws of California to market, promote,

24

25

26

27   [5]   *See* Banquet-About Us, The Internet Archive,
     https://web.archive.org/web/20200920181003/https://www.banquet.com/about-us
28   (last visited Mar. 28, 2022).

1 | distribute, and sell its poultry products to consumers in California and in the Central
2 | District of California.

3 | 20. Diversity subject matter jurisdiction exists over this class action
4 | pursuant to the Class Action Fairness Act of 2005, Pub. Law No. 109-2, 119 Stat. 4
5 | (2005), amending 28 U.S.C. § 1332, at new subsection (d), conferring federal
6 | jurisdiction over class actions involving: (a) 100 or more members in the proposed
7 | class; (b) where at least some members of the proposed class have different citizenship
8 | from some defendants; and (c) where the claims of the proposed class members
9 | exceed the sum or value of five million dollars ($5,000,000) in the aggregate. 28
10 | U.S.C. § 1332(d)(2) and (6).

11 | 21. While the exact number of members in each proposed class is unknown
12 | at this time, Plaintiff has reason to believe that thousands of consumers purchased
13 | Defendant's poultry products throughout California during the relevant period. The
14 | number of class members could be discerned from the records maintained by
15 | Defendant and/or its distributors.

16 | 22. While the exact damages to Plaintiff and the members of the classes are
17 | unknown at this time, Plaintiff reasonably believes that their claims exceed five
18 | million dollars ($5,000,000) in the aggregate.

19 | 23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because
20 | a substantial portion of the events or omissions giving rise to the claims occurred in
21 | this District. Defendant marketed, advertised, and sold the poultry products at issue
22 | in the Central District of California, and Plaintiff suffered an injury in the Central
23 | District of California.

## FACTUAL BACKGROUND

### I. Defendant's Poultry Products

26 | 24. Defendant put into commerce several different poultry products during
27 | the applicable class period (April 1, 2016 – Present) within the meaning of 21 U.S.C.
28 | §§453(a) and (f). These products include, without limitation, the following poultry

HAEGGQUIST & ECK, LLP

products sold under Defendant's "Banquet" brand (hereinafter referred to as the "Poultry Products")[6]:

<div style="margin-left:2em">

(1)    Popcorn Chicken

(2)    Chicken Breast Tenders

(3)    Chicken Breast Tenders – Buffalo Style

(4)    Chicken Breast Strips

(5)    Whole Grain Chicken Breast Strips

(6)    Chicken Breast Nuggets

(7)    Chicken Breast Patties

(8)    Boneless Wyngz – Buffalo Style

(9)    Boneless Wyngs – Honey BBQ

(10)  Original Chicken Breast Tenders

(11)  Original Chicken Breast Patties

(12)  Original Crispy Fried Chicken

(13)  Bone-In Wings – Hot & Spicy

</div>

25. Based on information and belief, Defendant caused most, if not all, of the Poultry Products, to be placed into commerce in or before 2016. Defendant marketed, advertised, and sold its Poultry Products throughout the United States, including within California, and it sought to reach consumers through advertising via circulars, coupons, on its website, and other media.

26. The Poultry Products are available for purchase at retail locations throughout the United States, including in California, such as at Vons, Albertson's, Safeway, Ralph's, Walmart, 99 Cents Only, Smiths, and Stater Bros.

---

[6] Most, if not all, of the Poultry Products were packaged in a Box and/or Bag, and some of the products were offered in "Jumbo" size and a "Family Pack" size.

8

HAEGGQUIST & ECK, LLP

HAEGGQUIST & ECK, LLP

## II.   Defendant Violated the UCL by Violating the Poultry Products Inspection Act

### A.   Defendant Unlawfully Placed its Popcorn Chicken Product into Commerce Without First Obtaining FSIS Approval in Violation of the PPIA

27.   Poultry products are federally regulated under the PPIA, codified at 21 U.S.C. §451, *et seq*., empowering the U.S. Secretary of Agriculture to ensure that poultry products are "not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. §451. The PPIA accomplishes this goal by, *inter alia*, authorizing the Secretary of the U.S. Department of Agriculture ("USDA") to establish labeling standards and prohibit the sale of adulterated, misbranded, or uninspected poultry products.  *See* 21 U.S.C. §§457, 458. The Secretary delegated authority to oversee poultry products to the FSIS (9 C.F.R. §300.2(a)), and FSIS promulgated regulations to govern the label approval process: "No final label may be used on any product unless the label has been submitted for approval to the FSIS Labeling and Program Delivery Staff … and approved by such staff, except for generically approved labels …." *Id.* §412.1(a).

28.   "Generically approved labels are labels that bear all applicable mandatory labeling features … in accordance with Federal regulations and do not bear special statements and claims as defined in §412.1(e)." 9 C.F.R. §412.2(b). "Generic" labels are deemed approved without being submitted to the FSIS for evaluation. Almost all other labeling claims are classified as "special statements and claims," and must be submitted to FSIS in the form of a final label for approval (aka "sketch approval"). *Id.* 412.1(c), (e). For example, "natural" claims on labels, "regardless of whether they are defined in the Food Standards and Labeling Policy Book" constitute a special statement and claim that must be submitted to FSIS. *Id.* 412.1(e)(1)(ii). In short, "it is unlawful to place products requiring initial sketch approval into commerce without preapproval." *Cohen*, 2023 U.S. Dist. LEXIS 127656, at *26, citing 9 C.F.R. §412(a); *see also* 21 U.S.C. §457(c); Prior Label

Approval System, Expansion of Generic Label Approval, 88 Fed. Reg. 2798 (Jan. 18, 2023) ("Without approved labels, meat, poultry, and egg products may not be sold, offered for sale, or otherwise distributed in commerce.").

29.   Defendant's Poultry Product labels were subject to federal regulation under the PPIA. Based on information and belief, Defendant has been placing the Poultry Products with labels containing representations of "100% Natural White Meat Chicken" and "No Preservatives!", "No Artificial Colors", and "No Artificial Flavors" since on or before September 13, 2018.[7]  For example:



30.   The product labels contained special statements and claims, including the claim of "100% Natural" and otherwise include claims not defined in the Federal meat and poultry inspection regulations or the Food Standards and Labeling Policy Book. *See Cohen,* 16 F.4th at 1286 ("Under the PPIA, certain poultry products, like the ones in this case, must be preapproved by a federal agency before the products go to market."). As such, to comply with the PPIA, Defendant was required to receive preapproval of the Poultry Product labels by the FSIS *before* placing the products into commerce.

---

[7]   *See* Internet Archive, https://web.archive.org/web/20190322234937/https://www.banquet.com/chicken-meals (last visited August 25, 2023)

HAEGGQUIST & ECK, LLP

31.     However, based on information and belief, Defendant violated the PPIA by placing the Popcorn Chicken product with the above-shown label into commerce before and without first receiving preapproval from the FSIS. For example, Defendant's "Popcorn Chicken" product with this label has been in commerce since at least September 13, 2018, if not before.[8]  Defendant did not obtain sketch approval for the Popcorn Chicken product until February 24, 2022 (after this lawsuit was filed), and after the "Box" packaging for the Popcorn Chicken had already been discontinued, according to evidence supplied by Defendant. As such, Defendant unlawfully placed the Popcorn Chicken product with the label at issue into commerce without preapproval from the FSIS in violation of the PPIA. Additionally, Defendant violated the PPIA and implementing regulations by failing to provide adequate substantiation of Defendant's claims to the USDA, the same concern raised by four U.S. Senators, *supra* ¶ 6.  When Defendant submitted its applications to USDA for label approval, Defendant failed to provide adequate information to USDA to put USDA on notice of the true facts underlying Defendant's claims to consumers.

32.     In turn, because California's UCL borrows violations from other laws making them independently actionable as unfair competitive practices (*Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal. 4th 1134, 1143 (2016), Defendant's violations of the PPIA are independently actionable under the UCL.

33.     Similarly, the sheer act of placing the Popcorn Chicken product into the market represented to consumers that Defendant had obtained federal agency approval in compliance with the PPIA – a law upon which consumers have relied for more than half a century to keep them safe from products that are not wholesome, adulterated, and not properly marked, labeled, and packaged. However, Defendant

---

[8]     *See* Internet Archive, https://web.archive.org/web/20201001004750/https://www.banquet.com/other-favorites/popcorn-chicken-box (last visited 8/25/2023).

HAEGGQUIST & ECK, LLP

1  placed the Popcorn Chicken product into the market without first obtaining FSIS

2  approval. In doing so, Defendant misrepresented to consumers the approval,

3  certification, standard, and/or quality of the Popcorn Chicken product in violation of

4  the CLRA. In the same vein, the way Defendant violated the PPIA also violated

5  California's Health & Safety Code §114087(a), which requires that food "offered for

6  human consumption shall be *honestly* presented *in a way* that does not mislead or

7  misinform the consumer." *Id.* (emphasis added). By passing off its Popcorn Chicken

8  product as having agency approval by placing it in the market, Defendant did not

9  "honestly" present the product in a way that does not mislead or misinform

10  consumers. The violation of California's Health & Safety Code §114087(a) provides

11  an independent predicate violation for a UCL claim.

**B.  Defendant Made False and Misleading Statements on the Labels of its Poultry Products in Violation of the PPIA**

12

13  34.   As stated above, for years, Defendant placed into commerce the Popcorn

14  Chicken product with a label that was not pre-approved by the FSIS. Defendant also

15  placed into commerce the other Poultry Products throughout the statutory period.[9]

16  The labels were false and misleading and otherwise misbranded the products. The

17  PPIA prohibits the sale of poultry "under any name or other marking or labeling which

18  is false or misleading." 21 U.S.C. §457(c). Similarly, the PPIA strictly prohibits

19  Defendant from offering for sale any products that are "misbranded." 21 U.S.C.

20  §458(a)(2). A poultry product is "misbranded" if "its labeling is false or misleading

21

22

23  _____

[9]   Plaintiff is cognizant of the Ninth Circuit's opinion in *Cohen v. ConAgra*

24  *Brands, Inc.,* 16 F.4th 1283 (9th Cir. 2021) and the Court's Order Granting Motion

25  for Reconsideration (ECF No. 90) granting, in part, Defendant's motion to dismiss as to the eleven products identified in the order.  Plaintiff is realleging facts relating to

26  those previously dismissed products to: (1) ensure his claims as to those products are not waived and preserved for appeal as they were not dismissed with prejudice and

27  without leave to amend; and (2) clarify his legal theories regarding the same. Those

28  products were identified in the First Amended Complaint, Dkt. 43, ¶ 17.

1    in any particular." 21 U.S.C. §453(h)(1). The Defendant violated the PPIA in this

2    regard.

3        35.    Defendant's claim that the Poultry Products are made with "100%

4    Natural White Meat Chicken" is false and misleading to a reasonable consumer.

5    Defendant is incentivized to deceptively lure consumers to purchase its products with

6    the claim of "natural." Over the past decade, Consumer Reports has performed

7    surveys on food marketing, including in 2016, 2015, 2008, and 2007.[10] The surveys

8    tested consumer interest in buying "natural" products. The 2015 survey found that

9    62% of consumers purchase "natural" products and that 87% of those purchasers *are*

10   *willing to pay more* for products called "natural" that meet their expectations as to

11   what "natural" means. The 2016 survey found the number of consumers who purchase

12   "natural" products to be as high as 73%.

13       36.    As the surveys indicate, reasonable consumers expect that poultry

14   advertised as "natural" is derived from a "natural" source (e.g., the raising, feeding,

15   and husbandry practices enable the product to remain "natural"), a "natural" process

16   (e.g., the process of converting live chickens to a packaged product retains  "natural"

17   characteristics, such as not adding chemical antimicrobial treatments during

18   processing), and results in a "natural" product (e.g., no addition of other ingredients

19   or synthetic materials to the final product).

20       37.    Here, Defendant advertises and markets the Poultry Products not only as

21   "natural," but "100% Natural," raising consumer expectations even higher. With

22   respect to Defendant's Poultry Products, neither the source, process, nor resulting

HAEGGQUIST & ECK, LLP

[10]    Consumer Reports, founded in 1836, is "an independent, nonprofit member organization that works side by side with consumers for truth, transparency, and fairness in the marketplace." It has six million members and tests tens of thousands of products annually to provide consumers with product reviews. Consumer Reports has a Survey Research department that conducts more than one hundred surveys per year. Its surveys are not commissioned or financed by industry.

13       Case No.: 8:20-cv-00637-DOC-ADS

product is "100% Natural." As a result, consumers purchase Defendant's Poultry Products based on a flawed understanding of the source, production process, and resulting product.

38.     The USDA specifically states that any USDA approval of a label is not an approval of processing procedures. The application form, FSIS Form 7234-1, states, "Approval of the sketch does not convey approval of the processing procedures." Approval of the processing procedures, and whether Defendant's representations to consumers are false or misleading in light of those processing procedures, is not part of the sketch label review process.

39.     Reasonable consumers believe that Defendant's claim of "no preservatives," "no artificial flavors," and "no artificial colors" on the label refers to the product as a whole, not just the meat component of the product. Indeed, Defendant's advertising aside from the label, e.g., on its website, evidence Defendant intended consumers to believe the product *as a whole* contains no preservatives:

- "They're made with 100% natural white-meat chicken, *and* without preservatives, artificial flavors, or artificial colors." (image reproduced *infra*, ¶ 72)

- "They're made with 100% natural* white-meat chicken. Microwaved or oven-baked, they're a quick, *tasty treat without* artificial colors, artificial flavors, or preservatives."[11]

40.     As Defendant's advertising makes clear, Defendant intends consumers to believe the Poultry Products, as a whole, do not contain preservatives. This is deceptive because the products do contain preservatives. The Poultry Products include ingredients such as Sodium Acid Pyrophosphate ("SAPP"), Sodium

---

[11]     *See* Internet Archive, Defendant's website October 1, 2020 (https://web.archive.org/web/20201001021809/https://www.banquet.com/nuggets/original-chicken-nugget-box) (emphasis added)

HAEGGQUIST & ECK, LLP

14

Tripolyphosphate ("STTP"), and Modified Corn Starch.

41.     STPP and SAPP are preservatives that are phosphorus based; they are both "inorganic" compounds. Consuming too many phosphates—especially as an additive in processed foods—can contribute to an increased risk of heart disease and exacerbate kidney disease symptoms.[12]  In addition, SAPP, when consumed in a large amount for an extended period, can harm the immune system.[13]

42.     Even if a consumer reading Defendant's product labels concluded its representation of "100% Natural White Meat Chicken" with "no preservatives" described only the meat component (contrary to Defendant's own advertisements, consumer polls, and the plain language), a reasonable consumer would nonetheless be misled because the meat component of the products does not meet consumer's reasonable expectations regarding Defendant's claims of "100% Natural White Meat Chicken."

43.     First, the "ingredient" list for the Poultry Products is separated into three categories: (1) meat; (2) Breader; and (3) Batter.  In the "meat" category (aside from the breader and batter), the meat includes ingredients other than "100% Natural White Meat Chicken," such as modified corn starch, soy flour, isolated soy protein, and autolyzed yeast extract. Modified corn starch is a direct food additive. It is a starch that has been altered to improve its thickening properties and before the starch is modified it is separated from the protein through isolation techniques. Isolated soy protein is derived from soybeans that are chemically engineered to "isolate" their

---

[12]     Ritz, *et. al.*, *Phosphate Additives in Food—a Health Risk,* U.S. National Library of Medicine National Institutes of Health*,* (Jan. 22, 2012), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3278747/.

[13]     Abd-Elhakim et. Al., *Effects of the food additives sodium acid pyrophosphate, sodium acetate, and citric acid on hemto-immunological pathological biomarkers in rats*, ScienceDirect, (Sept. 2018), available at https://www.sciencedirect.com/science/article/pii/S1382668918301571.

HAEGGQUIST & ECK, LLP

proteins, which strips out other nutrients in the original bean. Moreover, according to the USDA, over 90% of the soybeans grown in the U.S. are genetically modified, so most soy comes from altered beans. Most isolated soy protein is chemically modified, processed, and filled with pesticides. Autolyzed yeast extract is a flavoring agent from yeast. In short, the *meat component* of the Poultry Products is not "100% Natural White Meat Chicken" as Defendant claims.

44.     Second, polls and surveys that have been conducted regarding consumer expectations of products advertised as "100% Natural" show that consumers also have expectations about the care and feeding of the animals that are advertised as sources of "natural" meat.

45.     Specifically, consumers believe "natural" meat is raised without the use of hormones, antibiotics, or drugs; the animals themselves are not genetically modified organisms ("GMO," also sometimes referred to as "bioengineered") or given feed containing GMO foods or artificial ingredients; and the animals are permitted to go outside.[14]

46.     However, neither the poultry Defendant uses in its Poultry Products nor the finished products, meet a reasonable consumer's expectation for products labeled "100% Natural." Defendant does not have total vertical integration of its production, and it does not entirely own the supply chains through which it acquires the poultry it processes into its various Poultry Products. In fact, Defendant has not had direct

---

[14]     *See* Consumer Reports National Research Center, "Natural and Antibiotics Labels Survey" (2018), available at https://advocacy.consumerreports.org/wp-content/uploads/2018/10/2018-Natural-and-Antibiotics-Labels-Survey-Public-Report-1.pdf (last visited March 23, 2022); Consumer Reports National Research Center, "Natural Food Labels Survey" (2015), available at https://web.archive.org/web/20170211000950/http://www.consumerreports.org/content/dam/cro/magazine-articles/2016/March/Consumer_Reports_Natural_Food_labels_Survey_2015.pdf (last visited Mar. 28, 2022).

HAEGGQUIST & ECK, LLP

control of its supply chain since it divested poultry processing operations to Pilgrim's Pride in 2003.

47.     Plaintiff is informed and believes Defendant sources the poultry it uses to make its Poultry Products from companies such as Tyson, Sanderson Farms, and Pilgrim's Pride; and not from small, independent farmers.  These large companies account for nearly half the poultry processed in the United States, dominating an industry that relies on centralized control of processing operations which are highly mechanized to raise, slaughter, process, and sell poultry at the lowest cost to manufacturers (aka "factory farming").

48.     Based on information and belief, Defendant purchases poultry from these large companies that utilize factory farming which uses unnatural animal raising and feeding practices (aka husbandry practices).

49.     As a matter of standard business practice in the poultry industry, broiler chickens (i.e., chickens grown for their meat) are raised in filthy, crowded quarters where the birds have no room to move freely. The birds are not permitted to go outside, and the windowless coops where broiler chickens are raised do not even let the birds see daylight until the point at which they are loaded into large plastic crates and trucked to a slaughterhouse. The broiler chickens do not eat anything resembling the grass, grains, and insects that would be a "natural" diet for a chicken. Instead, commercial broiler chickens are fed on genetically modified, highly processed grains and vegetable products. To increase the bird's protein uptake, many broilers have their diets supplemented with meat and bone meal ("MBM") made from animal by-products, sometimes even chicken meat.[15] The use of MBM in poultry feed is

HAEGGQUIST & ECK, LLP

---

[15]     *See, e.g.*, Dr. Roy Brister, *Diet of a Chicken: Scientific, Sustainable but Not Simple*, Tyson (Jan. 07, 2019), https://thefeed.blog/2019/01/07/diet-of-a-chicken-scientific-sustainable-but-not-simple/; W. Va. Dep't of Env. Protection, "Engineering Evaluation/Fact Sheet,"

problematic because not only does it lead to cannibalism among the chickens, it runs the risk of bioaccumulating or biomagnifying toxic chemicals.[16] The diets of factory-farmed chickens also include dosages of antibiotics to promote growth. These practices do not meet a reasonable consumer's understanding of how a "natural" chicken is raised.

50.     In addition, the process of converting the live chicken into a food product results in an unnatural product. When broiler chickens are slaughtered, the chickens go through a process called "overhead shackling." Chickens are hung upside down from metal hooks that run along a mechanized assembly line. The birds are first partially electrocuted to stun them, then their throats are cut so they bleed to death. Any chickens that do not die from the stunning and exsanguination have the experience of being boiled alive to loosen their feathers. After scalding, the birds' carcasses pass through a mechanized plucking machine that pulverizes each chicken carcass with a series of rubberized fingers. The plucking process pulverizes the dead birds, and, because it occurs prior to evisceration, the blunt trauma inflicted by the plucking machine forcefully expels feces from the dead birds, which contaminates the carcasses with biological waste and bacteria.[17]

51.     After plucking, the chickens receive a systematic, mechanized disarticulation along complicated assembly lines. Because there is such a high degree

---

https://dep.wv.gov/daq/Documents/May%202017%20Draft%20Permits%20and%20Evals/1506D-Eval.pdf (last visited Mar. 28, 2022).

[16]     *See, e.g.*, Jose G. Dorea, *Vegetarian diets and exposure to organochlorine pollutants, lead, and mercury*, available at https://academic.oup.com/ajcn/article/80/1/237/4690285 (last visited March 28, 2022).

[17]     *See Antimicrobial Use in Poultry Processing*, Food Safety (Dec. 12, 2017), https://www.food-safety.com/articles/5581-antimicrobial-use-in-poultry-processing.

HAEGGQUIST & ECK, LLP

of cross-contamination (in large part due to fecal matter forcibly expressed from the chickens during mechanized plucking) commercially processed chickens receive several chemical antimicrobial treatments during butchery. Many of the chemicals commonly used for in-factory anti-microbial treatments affect the flavor, consistency, and color of treated chicken meat, thus changing it from what a reasonable consumer would consider "natural."[18]

52.    From the viewpoint of a reasonable consumer, "natural" chicken is not a bioengineered lifeform raised in exile from sunlight, systematically abused prior to slaughter, treated with antibiotics and other drugs, fed genetically modified foods, or forced to cannibalize its own kind in the name of faster growth, and repeatedly subjected to chemical antimicrobial treatments during butchery that can alter the flavor, texture, and color of its meat.

53.    Because animal husbandry and slaughter practices are generally uniform across the commercial chicken processing industry, Plaintiff is informed and believes that substantially all the chicken sourced by Defendant for the preparation of its Poultry Products during the class period was raised, slaughtered, and processed in accordance with the unnatural business model described in the preceding paragraphs. Thus, the source and process used by Defendant do not meet the reasonable consumer's expectation of "natural."

54.    Thus, aside from Defendant placing the Popcorn Chicken product in the market without first obtaining federal agency approval, product labels for the Poultry Products contained statements that were false, misleading, and deceptive in violation of the PPIA, UCL, CLRA, and FAL.

---

[18]    *See id.*

HAEGGQUIST & ECK, LLP

**C.** **Conagra Cannot Rely On Any Finding by USDA/FSIS That Defendant's "Natural" Representation is Not False or Misleading with Respect to the Source of Defendant's Poultry Products Because USDA/FSIS Has Not Made That Finding, Nor Does the FSIS Have Constitutional or Statutory Authority to Make Such a Finding**

55.    Even if the labels for the Poultry Products were submitted and allegedly "approved" by the FSIS, any such approval did not extend to whether the source of the Poultry Products was "natural" and/or whether the claims relating thereto were false and misleading.

56.    Because the PPIA itself contemplates extensive state involvement, "Congress clearly did not intend to occupy the field of poultry products." *Ass'n des Elevers de Canards et d'Oies du Quebec v. Becerra* ("*Canards*")*,* 870 F.3d 1140, 1152 (9th Cir. 2017). The PPIA regulates ingredient requirements for the purpose of ensuring that poultry products are "wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. §451. This authorizes the USDA, through the FSIS, "to prescribe standards of identity or composition for poultry products." *Canards*, 870 F.3d at 1148. "These 'ingredient requirements' cannot be read to reach animal husbandry practices because federal law '*does not regulate in any manner the handling,* shipment, or sale of *live poultry*." *Id.* (emphasis in original). "Accordingly, the PPIA's 'ingredient requirements' are limited to the physical components of poultry products and do not reach the subjects of animal husbandry or feeding practices." *Id.*

57.    Plaintiff's animal husbandry and feeding claim with respect to Defendant's use of "natural" to market and advertise its Poultry Products, does not solely relate to "ingredients" in the products. It also relates to the treatment of chickens – which starts well before the birds are even slaughtered.

58.    As such, even if the FSIS in fact subsequently reviewed and approved some of Defendant's Poultry Product labels regarding Defendant's claim of "natural," any such review and approval would have been limited to regulating the ingredient requirements of the final physical components of the products, not whether the poultry

HAEGGQUIST & ECK, LLP

HAEGGQUIST & ECK, LLP

1   was unnatural because of the animal husbandry and feeding practices – the latter of

2   which is also at issue in this case. This is consistent with the USDA's interpretation

3   of the definition of "natural." While "natural" is a claim that is undefined in FSIS's

4   regulations, it is defined in the USDA's Food Standards and Labeling Policy Book,

5   which refers solely to the ingredients in the final physical product. FSIS has expressly

6   proscribed its review of a claim of "natural," when used on the labels of meat and

7   poultry products, as one that is intended to "reflect the characteristics of the finished

8   product", and "one that is ***not*** intended to encompass animal production practices."

9   Product Labeling: Use of the Voluntary Claim "Natural" in the Labeling of Meat and

10   Poultry Products, 74 FR 46951 (09/14/2009) (emphasis added).  Defendant's Poultry

11   Products also do not meet USDA's stated understanding of natural, which is "no

12   artificial ingredient" and "only minimally processed."[19] As such, the FSIS does not

13   review or approve labels with claims of "natural" as they relate to animal husbandry

14   and feeding practices, nor does it have the authority to do so.  "The USDA has even

15   represented in legal filings that '[t]he PPIA is wholly silent on the treatment of farm

16   animals, (including feeding procedures) or methods of slaughter for poultry.'"

17   *Canards*, 870 F.3d at 1148.

18       59.    Rather, it is establishments, like Defendant, that are ultimately charged

19   with ensuring that labels used on their products containing claims that reasonable

20   consumers believe relate to animal husbandry and feeding practices are not false or

21

22

───────────────

23   [19]    Ask FSIS, "What does natural meat and poultry mean? A product labeled

24   'natural' is a product containing no artificial ingredient or added color and is only
     minimally processed. Minimal processing means that the product was processed in a

25   manner that does not fundamentally alter the product. The label must include a
     statement explaining the meaning of the term natural (such as 'no artificial

26   ingredients; minimally processed')," available at https://ask.usda.gov/s/article/What-
     does-natural-meat-and-poultry-

27   mean#:~:text=A%20product%20labeled%20%22natural%22%20is,not%20fundame

28   ntally%20alter%20the%20product, last visited on September 1, 2023.

misleading.  Here, Defendant has failed to meet its obligation by placing products into commerce with labels that falsely mislead consumers into believing the source of its meat products is "100% Natural."

> **D.     Defendant Failed to Comply with the Underlying Agency Process and Any Subsequent Agency Approval of Defendant's Labels Does Not Equate to a Finding that the Labels were Not False or Misleading**

60.     The very government regulator who is supposed to be guarding the hen house, namely, the USDA/FSIS, has found that labels such as Defendant's, despite a stamp of approval, may still be false and misleading. The USDA, Office of the Inspector General ("OIG") investigated its label review process and concluded that inaccurate labels are in commerce.

61.     The June 2020 report, titled *Controls Over Meat, Poultry, and Egg Product Labels*, indicated how unreliable these meat and poultry labels are, even if USDA has approved them:

> As a result, meat, poultry, and egg product labels may reflect inaccurate statements and claims made by establishments. Additionally, there is reduced assurance that establishments' generic labels meet requirements. Based on our sample results, we estimated that approximately 2,038 (15.00 percent) of the approved required labels and 161 (18.34 percent) of the approved generic labels may have one or more exceptions.[20]

62.     In fiscal year 2018, USDA's 18-member Labeling and Program Delivery Staff (LPDS) reviewed and approved approximately 14,000 labels.[21] That averages

---

[20]     USDA, Audit Report 24601-0002-23, https://www.usda.gov/sites/default/files/audit-reports/24601-0002-23.pdf, last visited March 28, 2022.

[21]     USDA, Audit Report 24601-0002-23, https://www.usda.gov/sites/default/files/audit-reports/24601-0002-23.pdf, last visited March 28, 2022.

out to approximately 778 labels per staffer in one year. Staff are trained to review eight required labeling features:

> (1) product name,
>
> (2) handling statements,
>
> (3) the establishment number and inspection legend,
>
> (4) net weight,
>
> (5) manufacturer's name and place of business,
>
> (6) ingredient statements,
>
> (7) nutrition labeling, and
>
> (8) safe handling instructions.

63.     Given the volume of labels that arise from over 6,000 establishments, as the USDA's OIG Report points out, USDA "is responsible for administering and enforcing meat, poultry, and egg product labeling requirements, and establishments are responsible for ensuring that the labels used on their products are not false or misleading." It is establishments, like Conagra, that are charged with ensuring that the marketing terms used on their products are not false or misleading. Here, Conagra has failed to meet its obligation under the PPIA.

64.     The Animal Welfare Institute also studied meat and poultry labels for many years and in September 2019 issued a report titled, *Label Confusion 2.0: How the USDA Allows Producers to Use "Humane" and "Sustainable" Claims on Meat Packages and Deceive Consumers.*[22] The report is based on approximately four years of Freedom of Information Act requests sent to USDA, FSIS. The Institute determined that USDA's process does not meet consumer expectations, leads to misleading and

---

[22]     Animal Welfare Institute, Label Confusion 2.0, https://awionline.org/sites/default/files/publication/digital_download/19%20Label%20Confusion%20Report%20FINAL%20WEB%20II.pdf, last visited March 28, 2022.

HAEGGQUIST & ECK, LLP

deceptive labeling, and harms farmers who use accurate claims. The report stated at page 5:

> Food labels are theoretically used to help consumers make educated purchasing decisions. But if consumers do not know the meaning of label claims—and have no ability to access that information—an educated consumer base does not exist and companies using misleading labels receive an unfair competitive advantage.

65.   Farm Forward, a public interest group, also studied how consumers are deceived by meat and poultry labels and issued its report in December 2020 titled *The Dirt on Humanewashing: A Farm Forward Report on Consumer Deception in Animal Welfare Certification*.[23] Relevant to Defendant's advertising and labeling, the report lists "natural" as a common deceptive label claim used to "humanewash" poultry products, and also addresses neglected animal welfare issues, including "unhealthy genetics and pandemic risk" in the chicken industry.[24]

66.   Now that it is known by the USDA, industry, and advocates that even labels rubber-stamped by the FSIS are deceptive and misleading, U.S. Senators have urged the USDA to act on misleading labels.[25]

67.   Moreover, compliance with the PPIA requires Defendant to substantiate

---

[23]   Farm Forward, *The Dirt on Humanewashing*, https://res.cloudinary.com/hyjvcxzjt/image/upload/v1609362305/resource/undefined-the-dirt-on-humanewashing-farm-forward-1609362294.pdf, last visited March 28, 2022. Humanewashing is defined as "efforts to market animal products by promoting the illusion of animal well-being while concealing the extent of animals' illness and suffering."

[24]   *Id.* at 24.

[25]   *See* March 30, 2023 press release and call to action by U.S. Senators on USDA to Address Misleading Meat Labels; Animal Welfare Institute, Deceptive Consumer Labels 2023; Petition Submitted to FSIS by Perdue Foods LLC (Mar. 16, 2023) (Pet. No. 23-03).

any claims that its chicken is "100% Natural" by providing the FSIS with sufficient documentation to support a claim that its Poultry Products are properly labeled as "natural." 9 C.F.R. § 412.1(e)(1)(ii); see *Food Safety and Inspection Service Guidelines on Documentation Needed to Substantiate Animal Raising Claims for Label Submissions*. The USDA's response to Plaintiff's Freedom of Information Act request suggests Defendant failed to follow the PPIA and its implementing regulations and guidelines by, *inter alia,* failing to provide the FSIS with information to determine whether Defendant has misled the federal agency about the poultry it uses to manufacture its purportedly "100% Natural" claim. The sketches stamped with approval by the FSIS are expressly "subject to compliance with FMIA & PPIA & Regulations." Defendant has not complied with the PPIA and regulations.

68. This is particularly problematic considering the FSIS has confirmed it does not even have any reports or studies on consumer understanding and consumer expectations of "natural" or "preservatives."

69. Finally, as stated above, even the *meat* component of the products (aside from the breader and batter) contained ingredients that are undisputedly not "100% Natural White Meat Chicken," containing ingredients such as isolated soy protein. As such, the agency approval process (or lack thereof) in rubber-stamping the labels for Defendant's Poultry Products was arbitrary, capricious, and/or without observance of the procedures required by law. Any such approval must be set aside and cannot form the basis for a blanket finding that Defendant's labels are not misleading or deceptive. 5 U.S.C. §706(2)(A), (D).

70. Thus, even if Defendant subsequently received an approval stamp from FSIS on its "sketch" for the labels of some of the Poultry Products, it does not equate to a finding that all of the representations on the labels were not false or misleading. As demonstrated herein, Defendant's labels on the Poultry Products are undisputedly false and misleading.

HAEGGQUIST & ECK, LLP

HAEGGQUIST & ECK, LLP

### III. Aside from the Misrepresentations on the Labels of Defendant's Poultry Products, Defendant Made Material Misrepresentations and Otherwise Deceived Consumers Via its Advertising and Marketing

71.     Defendant's marketing and advertisements about the Poultry Products via media outside of the labels on the Poultry Products, such as those made on websites, circulars, coupons, and other media, are outside the purview of the federal agency's review under the PPIA because such representations are not reviewed by the FSIS. *See Cohen.,* 16 F.4th at 1290, citing 21 U.S.C. §453(s). Defendant's marketing representations made via these other media were not reviewed by FSIS, nor does FSIS or the USDA have congressional authority to regulate advertising or make determinations whether representations made via these other media may be false, misleading, or otherwise deceptive.

72.     As stated above, Defendant's website, for example, advertised its Poultry Products throughout the class period in ways that are false, misleading, and otherwise deceptive to reasonable consumers:

- "They're made with 100% natural white-meat chicken, and without preservatives, artificial flavors, or artificial colors."

- "They're made with 100% natural* white-meat chicken. Microwaved or oven-baked, they're a quick, tasty treat without artificial colors, artificial flavors, or preservatives."[26]

---

[26] *See* Internet Archive, Defendant's website October 1, 2020 (https://web.archive.org/web/20201001021809/https://www.banquet.com/nuggets/original-chicken-nugget-box)

73.     The representations made on the labels as compared to those made on Defendant's website are not materially identical. Via the website representations, Defendant undisputedly claims that the poultry products are "100% natural" and *as a whole* are made without preservatives, artificial flavors, or artificial colors, which is false and misleading because the products are made with such ingredients. As stated above, the Poultry Products include ingredients, such as STTP and SAPP (preservatives), and Modified Corn Starch. The synthetic ingredients and preservatives are in direct contradiction to Defendant's claims that the Poultry Products do not contain preservatives and are "100% Natural."

74.     Moreover, Defendant's website is structured in a way that online purchasers must click two or three times to find the web page with ingredients. Defendant fails to disclose its unnatural practices, such as using synthetic, non-natural ingredients, and/or the non-natural process in raising and creating the Poultry

HAEGGQUIST & ECK, LLP

Products. Based on information and belief, further discovery will reveal similarly false, misleading, and deceptive representations made via other media, such as circulars and coupons.

75.     Plaintiff and members of the proposed classes were exposed to Defendant's media, and the representations made therein. Class members' exposure to Defendant's online advertising representations only increased during the COVID-19 pandemic because more consumers began shopping online for food.

## IV. Defendant Knows that Its Claims Are False, Misleading, and Deceptive for Reasonable Consumers

76.     Defendant knows, or reasonably should know because it is a large distributor of food products, that consumers think that "natural" means chicken from a natural source and process that was not made with added preservatives or artificial ingredients. Defendant also knows, or should reasonably know, that the ingredients that it is using are synthetic and not natural. Therefore, Defendant knows, or should reasonably know, that it is making false, misleading, or deceptive statements to consumers as described above.  Defendant also knows, or reasonably should know, that consumers understand "100% Natural" and "without preservatives" to mean that there are no preservatives or synthetic ingredients within the product that they are purchasing.  Finally, Defendant knows, or should know, that reasonable consumers believe that when Defendant has placed a poultry product on the market, such products are legally compliant and have been preapproved.

## V.  Plaintiff's Experience

77.     Plaintiff purchased Defendant's Poultry Products and he relied on Defendant placing legally compliant products in the market and making truthful representations about whether these products were in fact natural and had no preservatives, artificial colors, or flavors. Plaintiff was exposed to the website marketing claims in early 2018. Plaintiff searched "Banquet" on the Bing.com search engine, found Defendant's website for Banquet (www.banquet.com), and viewed

HAEGGQUIST & ECK, LLP

Defendant's website, which promised that the Poultry Products (specifically the Banquet products described herein) were "100% Natural" and having no preservatives, artificial colors, or artificial flavors. In addition to Defendant's main website, Plaintiff found information in approximately early 2018 on another website (www.readyseteat.com) that publishes recipes, coupons, and information about Defendant's Poultry Products and that re-iterated that Defendant's Poultry Products were "100% Natural" and have no preservatives, artificial colors, or flavors. Plaintiff also viewed Defendant's marketing in local newspaper circulars for approximately 10 years. Plaintiff was also exposed to the label claims on the packages of the Poultry Products.

78.     Plaintiff began purchasing Defendant's Poultry Products in approximately 2015 and throughout the next several years. In the first several years of purchasing Defendant's Poultry Products from 2015 to early 2018, Plaintiff did not have any reason to doubt the veracity of the "100% Natural" claim, or that the products were lawfully on the market. Like reasonable consumers, Plaintiff relied on the representations made in large, bold type on the front of the packages and from the representations made by Defendant in its advertising on its website and other media. Because Plaintiff purchased as early as 2015, Plaintiff was exposed to and relied upon Defendant's representations on earlier versions of Defendant's product packaging, which also included the "100% Natural" claim. At least some of these packages promised that the product was minimally processed and made without artificial ingredients.

79.     After learning in 2018 about other chicken products sold by different companies that were wrongfully marketed as natural, Plaintiff became concerned in early 2018 about whether the express claims prominently displayed on Defendant's Poultry Products he purchased were true. Plaintiff contacted Defendant with his concerns in early 2018. Defendant did not respond, other than an auto-reply in March 2018.

HAEGGQUIST & ECK, LLP

80.     Plaintiff continued to purchase Defendant's Poultry Products in 2018, after receiving Defendant's March 2018 auto-reply, including Classic Chicken Strips, Chicken Nuggets, Fried Chicken, Sweet and Sour Chicken, Spaghetti and Chicken Nuggets, Classic Dinners, and products sold as Mega Meals and Meals. He purchased Defendant's Poultry one or two at a time from stores in Orange County, including: Walmart, located at 16555 Von Karman Avenue, Irvine, Orange County, California; Walmart, located at 71 Technology Drive, Irvine, Orange County, California; 99 Cents Only, located at 22631 Lake Forest Drive, Lake Forest, Orange County, California; 99 Cents Only, located at 13721 Newport Avenue, Tustin, California; Albertson's, located at 3825 Alton Parkway, Irvine, California; and Ralph's located at 13321 Jamboree Road, Tustin, Orange County, California.

81.     In 2018, Plaintiff began to study the fine print ingredients list on the back of these packages. Plaintiff contacted Defendant via email in approximately September 2018 to inquire about the identity of their chicken supplier. Defendant responded via email in October 2018 to state, "We source through multiple suppliers based on products currently available. While we like to stay transparent, there is some information that we simply cannot provide."

82.     Plaintiff continued to purchase Defendant's Poultry Products in January 2019, including Defendant's Chicken Breast Nuggets, Breaded Chicken Patties, and Popcorn Chicken at stores including: Stater Bros., store #198, located at 15150 Kensington Park, Tustin, Orange County, California, and he was able to confirm that Defendant had not changed its marketing of the Poultry Products. Plaintiff became so concerned about the veracity of the 100% Natural claims that he issued a demand to Defendant pursuant to the Consumer Legal Remedies Act in May 2019.

83.     In total over several years, Plaintiff purchased several different Poultry Products that Defendant marketed as "100% Natural" and/or made with "no preservatives!," "no artificial colors," and "no artificial flavors." Plaintiff would not have purchased these products had he known that they were on the shelves without

HAEGGQUIST & ECK, LLP

lawful approval and not being advertised truthfully. At the time he purchased Defendant's Poultry Products, he believed the above-quoted representations by Defendant were truthful.

84.     Plaintiff would purchase Defendant's Poultry Products in the future if he could be assured they were lawfully on the market with proper approval, no longer contained any artificial colors, flavors, or preservatives, and if he could be assured the 100% Natural claims in the Poultry Product's labeling and advertising were accurate, including that Defendant's chicken was not raised in a factory farming environment and slaughtered in a manner that makes the chicken not conform to what a reasonable consumer would consider "natural."

85.     Plaintiff, like most reasonable consumers, understood that Defendant's "100% Natural" and/or made with "no preservatives!," "no artificial colors," and "no artificial flavors"  representations mean, among other attributes, that a product is free of preservatives and synthetic ingredients. When Plaintiff questioned whether the advertising was truthful, Plaintiff investigated further by contacting Defendant, but Defendant did not respond to Plaintiff's query.

86.     As a result of Defendant's legal violations, Plaintiff has suffered injury in fact and has lost money or property.

87.     Because of Defendant's unlawful conduct and marketing representations, Plaintiff purchased Defendant's Poultry Products more than any other brand. He has lost money because he purchased the Poultry Products in reliance on Defendant's unlawful, materially false, misleading, and deceptive conduct regarding the Poultry Products. The injury to Plaintiff is not speculative; instead, expenses incurred by purchasing Defendant's Poultry Products, which resulted from Defendant's unlawful conduct, could have been spent on other products that were lawfully in the market and that accurately marketed their products as "100% Natural" and/or having no preservatives, artificial colors, or flavors.

88.     Defendant will continue to harm consumers by its unlawful conduct and

HAEGGQUIST & ECK, LLP

misleading advertising unless injunctive relief is obtained.

## CLASS ACTION ALLEGATIONS

89.    Plaintiff realleges and incorporates herein by reference each allegation in the preceding and subsequent paragraphs.

90.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure for the purposes of asserting the claims alleged in this amended Complaint on a common basis.

91.    As used herein, the following terms have the meanings set forth below:

(a)    "Class Period" means April 1, 2016 to the present.

(b)    "Senior Citizen" means a person who is 65 years of age or older as defined in the CLRA, Cal. Civ. Code § 1761(f).

92.    Plaintiff brings this action on behalf of himself and all members of the following classes:

**(c)    The California Sub-Class**

All persons who purchased in California one or more Poultry Products sold by Defendant during the Class Period.

**(d)    The California Senior Citizen Sub-Class**

All Senior Citizens who purchased in California one or more Poultry Products sold by Defendant during the Class Period.

**(e)    The Nationwide Unjust Enrichment Sub-Class**

All persons in the United States who purchased one or more Poultry Products sold by Defendant within the Class Period.

93.    Collectively, the three sub-classes are referred to as "the Class."

94.    Excluded from the Class are any of Defendant's officers, directors, or employees; officers, directors, or employees of any entity in which Defendant currently has or has had a controlling interest; and Defendant's legal representatives, heirs, successors, and assigns. Plaintiff reserves the right to modify, change, or expand the class definition, including proposing additional subclasses, based upon discovery

HAEGGQUIST & ECK, LLP

and further investigation.

95.     Upon information and belief, the scope of the Class and sub-class definitions, including its temporal scope, may be further refined after discovery of Defendant's and/or third-party records.

96.     **Numerosity**. The numbers of the Class, and each of the three sub-classes, are so numerous that joinder is impracticable. While the precise number of members of the Class, or each of the three sub-classes, has not been determined, Plaintiff is informed and believes the Class, and each of the three sub-classes, include at least thousands of individuals.

97.     **Typicality**. Plaintiff's claims are typical of the claims of the Class. Plaintiff is a member of a well-defined Class of similarly situated persons, and the members of the Class were similarly affected by Defendant's conduct and are owed the same relief, as alleged in this Amended Complaint. Members of the Class are ascertainable from Plaintiff's description of the Class and/or Defendant's records and/or records of third parties accessible through discovery.

98.     **Adequacy**. The representative Plaintiff will fairly and adequately represent the members of the Class and has no interests that are antagonistic to the claims of the Class. Plaintiff's interests in this action are antagonistic to the interests of Defendant, and Plaintiff will vigorously pursue the claims of the Class. Counsel who represents Plaintiff are competent and experienced in litigating large consumer class actions.

99.     **Commonality and Predominance**. Common questions of law and fact affect the rights of each member of the Class, and a common remedy is sought for the Class that will predominate over any individual issues. These common questions of law and fact include, without limitation:

(f)     Whether Defendant violated the PPIA by placing the placing the Popcorn Chicken product into commerce without first obtaining preapproval from the FSIS;

HAEGGQUIST & ECK, LLP

(g)     Whether Defendant violated the PPIA by deceiving reasonable consumers that its Popcorn Chicken product had received federal agency approval when it did not by placing the product on store shelves;

(h)     Whether Defendant violated the PPIA by deceiving reasonable consumers by making representations that are false, misleading, and deceptive on the labels of the Poultry Products;

(i)     Whether Defendant violated California's Health and Safety Code §114087(a) by dishonestly offering food for human consumption in a way that misleads and misinforms consumers;

(j)     Whether Defendant violated the CLRA, California Civil Code §1770(a)(2), (a)(3), (a)(5), (a)(7), and/or (a)(9)

(k)     Whether Defendant violated the UCL, Cal. Bus. & Prof. Code §§ 17200-17210

(l)     Whether Defendant violated the FAL, Cal. Bus. & Prof. Code §§ 17500-17536;

(m)     Whether Defendant was unjustly enriched by its unlawful conduct;

(n)     Whether Plaintiff and the Class were damaged; and

(o)     Whether Plaintiff and the Class are entitled to an award of restitution pursuant to California Business and Professions Code § 17203.

100.   A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of Plaintiff and the Class are nearly identical and will require evidentiary proof of the same kind and application of the same laws. There is no plain, speedy, or adequate remedy other than by maintenance of this class action.

101.   **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the Class members number in the thousands and individual joinder is impracticable. The expense and burden of

HAEGGQUIST & ECK, LLP

1   individual litigation would make it impracticable or impossible for the Class members
2   to prosecute their claims individually. The trial of Plaintiff's and the Class members'
3   claims is manageable.

4       102.   Plaintiff has retained counsel who are competent and experienced in
5   consumer protection litigation, including class actions relating to false advertising and
6   who has successfully represented plaintiffs in complex class actions.

7       103.   Plaintiff knows of no difficulty that will be encountered in the
8   management of this litigation that would preclude its maintenance of a class action.

9               **FIRST COUNT FOR RELIEF**

10          **(VIOLATION OF CALIFORNIA CONSUMER**
            **LEGAL REMEDIES ACT–CALIFORNIA**
11          **CIVIL CODE § 1750, *ET SEQ.*)**

12      104.   The allegations made in all preceding paragraphs are re-alleged and
13   incorporated by reference.

14      105.   The CLRA prohibits certain "unfair methods of competition and unfair
15   or deceptive acts or practices undertaken by any person in a transaction intended to
16   result or which results in the sale or lease of goods or services to any consumer." Cal.
17   Civ. Code § 1770(a).  In particular, the CLRA makes unlawful, *inter alia*, any of the
18   following actions that are intended to result or that result in the sale of goods to any
19   consumer:

20      (a)    Misrepresenting the source, sponsorship, approval, or certification of
21   goods or services (§1770(a)(2));

22      (b)    Misrepresenting the affiliation, connection, or association with, or
23   certification by, another (§1770(a)(3));

24      (c)    Representing that goods or services have sponsorship, approval,
25   characteristics, ingredients, uses, benefits, or quantities that they do not have or that a
26   person has a sponsorship, approval, status, affiliation, or connection that the person
27   does not have (§1770(a)(5));

28

HAEGGQUIST & ECK, LLP

(d)     Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another (§1770(a)(7)); and

(e)     Advertising goods or services with intent not to sell them as advertised (§1770(a)(9)).

106.   As stated in this complaint, Defendant violated one or more of the above-listed CLRA provisions.  Pursuant to Cal. Civ. Code § 1752, the provisions of the CLRA are not exclusive, and the remedies provided therein are in addition to any other procedures or remedies for any violation or conduct provided for in any other law.

107.   Plaintiff and other members of the California Sub-Class are "consumers," as the term is defined by Cal. Civ. Code § 1761(d), because they bought the Poultry Products for personal, family, or household purposes.

108.   Plaintiff and other members of the California Sub-Class have engaged in "transactions," as that term is defined by Cal. Civ. Code § 1761(e).

109.   Plaintiff is a "senior citizen," as that term is defined in Cal. Civ. Code § 1761(f); § 1780(b). Plaintiff and other members of the California Senior Citizen Sub-Class suffered economic damage resulting from Defendant's conduct.  Plaintiff seeks on behalf of himself and all other members of the California Senior Citizen Sub-Class, in addition to the remedies specified in the CLRA, up to $5,000 for suffering economic damage from Defendant's conduct, and/or upon a finding that an additional award is appropriate and/or to punish and deter Defendant pursuant to one of the factors set forth in Cal. Civ. Code §3345(b).

110.   Plaintiff complied with Cal. Civ. Code § 1782(a) regarding notice to Defendant on his own behalf and on behalf of the California Sub-Class. On May 13, 2019, Plaintiff sent a letter via certified mail. Defendant did not respond. Accordingly, pursuant to California Civil Code § 1780(a)(3), Plaintiff, on behalf of himself and all other members of the California Sub-Class, seeks compensatory damages, punitive

HAEGGQUIST & ECK, LLP

damages, and restitution of any ill-gotten gains due to Defendant's acts and practices.

111. Plaintiff's CLRA venue declaration is attached to this amended Complaint as Exhibit A, consistent with Cal. Civ. Code § 1780(d).

112. The conduct alleged in this complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendant in transactions intended to result in, and which did result in, the sale of goods to consumers.

113. Cal. Civ. Code § 1780(a) allows any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 to bring an action against that person to recover or obtain actual damages, injunctive relief, restitution of property, punitive damages, and any other relief that the court deems proper.

114. As a direct and proximate result of Defendant's violations, Plaintiff and members of the California Sub-Class suffered injury in fact because they purchased Defendant's Poultry Products, the Popcorn Chicken product of which was in commerce unlawfully in violation of the PPIA, and they purchased the Poultry Products with the reliance that the products were lawfully on the market with approval, and were "100% Natural" having no preservatives, artificial colors, or artificial flavors (which was false and deceptive).

115. Plaintiff seeks an order: (a) enjoining the acts and practices described above, (b) ordering damages and/or restitution of property, (c) punitive damages; (d) and any other relief that the Court deems proper.

116. Plaintiff additionally seeks attorneys' fees and costs, and any other relief under Civil Code §1780(e).

**SECOND COUNT FOR RELIEF**

**(VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW–CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, *ET SEQ.*)**

117. The allegations made in all preceding paragraphs are re-alleged and

HAEGGQUIST & ECK, LLP

incorporated by reference herein.

118.   California's UCL prohibits any "unlawful, unfair, or fraudulent business act or practice."  Cal. Bus. & Prof. Code §17200.  An alleged act need not violate all three prongs of the UCL – the violation of one prong is sufficient.  Defendant engaged in unlawful, unfair, and/or fraudulent conduct in violation of the UCL.

119.   Under the "unlawful" prong, "the UCL borrows violations from other laws making them independently actionable as unfair competitive practices." *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal. 4th 1134, 1143 (2016).  Defendant conducted the following unlawful activities:

(f)   Violations of the PPIA, 21 U.S.C. §457(c), 9 C.F.R. §§412.1(a)-(c), (e), 412.2(b), 88 Fed. Reg. 2798, by placing the Popcorn Chicken product into commerce without first obtaining preapproval from the FSIS;

(g)   Violations of the PPIA, 21 U.S.C. §§453(h)(1), 457(c), 458(a)(2), (a)(3), (c)(6), by deceiving reasonable consumers that its Popcorn Chicken product had received federal agency approval when it did not by placing the product on store shelves;

(h)   Violations of the PPIA, 21 U.S.C. §§453(h)(1), 457(c), 458(a)(2), (a)(3), (c)(6), by making representations that are false, misleading, and deceptive on the labels of the Poultry Products;

(i)   Violations of California Health and Safety Code §114087(a) by dishonestly offering food for human consumption in a way that misleads and misinforms consumers; and

(j)   Violations of California's FAL, California Business & Professions Code § 17500 *et seq.*, by deceiving reasonable consumers that its Popcorn Chicken products had received federal agency approval when it did not by placing the products on store shelves; and

(k)   Violations of California's FAL, California Business & Professions Code § 17500 *et seq.* by making representations that are false, misleading,

1  and deceptive on (i) the labels of the Poultry Products and (ii) in its advertising and

2  marketing via other media.

3      120.   Defendant's conduct is unfair in that it offends established public policy

4  and/or is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious

5  to Plaintiff, and reasonable consumers. The harm to Plaintiff and consumers arising

6  from Defendant's conduct outweighs any legitimate benefit Defendant derived from

7  the conduct. Defendant's conduct undermines and violates the stated spirit and

8  policies underlying the PPIA, FAL, Health and Safety Code, and other legal

9  regulations as alleged herein.

10      121.   Defendant's labeling, advertising, and marketing actions and practices

11  with regard to the Poultry Products and its process constitute "fraudulent" business

12  practices in violation of the UCL because, among other things, they are likely to

13  deceive reasonable consumers. As a direct and proximate result of Defendant's

14  violations, Plaintiff suffered injury in fact because he purchased Defendant's Poultry

15  Products with the reliance that the products were lawfully in commerce in compliance

16  with federal and state law, and were "100% Natural" having no preservatives,

17  artificial colors or flavors. Defendant knew its Popcorn Chicken product had not

18  received FSIS approval before placing the product in the market, and that the process

19  by which it creates its Poultry Products and the resulting product itself does not meet

20  reasonable consumer expectations for a product marketed as "100% Natural" having

21  no preservatives, artificial colors, or artificial flavors.

22      122.   Plaintiff seeks restitution on behalf of himself and the class, including

23  disgorgement of monies Defendant received from Plaintiff and the classes from their

24  purchases of Poultry Products during the period the Poultry Products were unlawfully

25  in commerce without preapproval from the FSIS in violation of the PPIA. Plaintiff

26  seeks restitution on behalf of himself and the class, including disgorgement of monies

27  Defendant received from Plaintiff and the classes from their purchases of Poultry

28  Products which they purchased in reliance on Defendant's false, misleading, and

HAEGGQUIST & ECK, LLP

39      Case No.: 8:20-cv-00637-DOC-ADS

SECOND AMENDED COMPLAINT

deceptive statements.

123.   Plaintiff seeks injunctive relief in the form of an order requiring Defendant to cease the acts of unlawful, unfair, and fraudulent competition alleged here and to correct its labeling, advertising, promotion, and marketing campaigns or to reformulate its products in ways that meet consumer expectations for "natural" and having no preservatives, artificial colors, or artificial flavors.

124.   Plaintiff also seeks the payment of Plaintiffs' attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure Section 1021.5.  Plaintiff also seeks interest at the highest rate allowable by law.

### THIRD COUNT FOR RELIEF

### (VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW–CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, *ET SEQ.*)

125.   The allegations made in all preceding paragraphs are re-alleged and incorporated by reference herein.

126.   "The false advertising law prohibits any 'unfair, deceptive, untrue, or misleading advertising." *Williams v. Gerber Prods. Co.,* 552 F.3d 949, 938 (9th Cir. 2008) (citing Cal. Bus. & Prof. Code §17500).  The FAL prohibits advertising that is false and advertising that "although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Kasky v. Nike, Inc.,* 27 Cal. 4th 939, 951 (2002).

127.   Defendant placed the Popcorn Chicken product into the market without first obtaining preapproval from the FSIS in violation of the PPIA, which was misleading to the reasonable consumer and/or which had the capacity, likelihood or tendency to deceive or confuse the public into believing the product was legally compliant when, in fact, it was not.

128.   Defendant also placed the Poultry Products into the market with labels that were false, misleading, and deceptive to a reasonable consumer as stated in this complaint.

HAEGGQUIST & ECK, LLP

129.   In addition, Defendant placed the Poultry Products into the market with advertising and marketing in media aside from its product labels, e.g., on its website, circulars, and coupons, which was false, misleading, and deceptive as stated in this complaint.

130.   Defendant knew, or should have known, that the Popcorn Chicken product did not have preapproval by the FSIS before placing it into the market. Defendant also knew, or in the exercise of reasonable care should have known, that advertising its products as "100% Natural" having no preservatives, artificial colors, or artificial flavors was false, misleading, and deceptive to a reasonable consumer.

131.   As a result, Defendant violated the FAL.

132.   As a direct and proximate result of Defendant's violations, Plaintiff suffered injury in fact because he purchased Defendant's Poultry Products with the reliance that the products were lawfully on the market, were "100% Natural" having no preservatives, artificial colors, or artificial flavors; and that the products were made with chicken that meets the standard for "natural" chicken.

133.   Plaintiff seeks restitution on behalf of himself and the class, including disgorgement of monies Defendant received from Plaintiff and the classes from their purchases of Poultry Products during the period the Popcorn Chicken products were unlawfully in commerce without preapproval from the FSIS in violation of the PPIA. Plaintiff also seeks restitution on behalf of himself and the class, including disgorgement of monies Defendant received from Plaintiff and the classes from their purchases of Poultry Products which they purchased in reliance on Defendant's false, misleading, and deceptive statements.

134.   Plaintiff seeks injunctive relief in the form of an order requiring Defendant to cease its unlawful conduct in violation of the PPIA and to cease the acts of false advertising alleged here and to correct its labeling, advertising, promotion, and marketing campaigns or to reformulate its products in ways that meet consumer expectations for "natural" and having no preservatives, artificial colors, or artificial

HAEGGQUIST & ECK, LLP

flavors.

135.   Plaintiff also seeks the payment of Plaintiffs' attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure Section 1021.5.  Plaintiff also seeks interest at the highest rate allowable by law.

## FOURTH COUNT FOR RELIEF
## (UNJUST ENRICHMENT)

136.   The allegations made in all preceding paragraphs are re-alleged and incorporated by reference herein.

137.   Defendant was unjustly enriched by its conduct of unlawfully placing the Popcorn Chicken products into commerce in violation of the PPIA, and by deceiving reasonable consumers with false, misleading, and deceptive labeling and advertising practices with respect to its Poultry Products in violation of the PPIA, CLRA, UCL, FAL, and California Health and Safety Code §114087(a). Through its unlawful conduct, Defendant received and retained the benefit from monies received from Plaintiff and the members of the classes it otherwise would not have achieved.

138.   Defendant has been unjustly enriched at the expense of Plaintiff and members of the classes and is now required to make restitution to Plaintiff and members of the classes.  It would be unjust and unfair for Defendant to retain any of the benefits obtained from its unlawful conduct. There are not other adequate remedies at law.

139.   Defendant should be ordered to disgorge the proceeds that it unjustly received from Plaintiff and the members of the classes.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Amended Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully request that the Court enter judgment in his favor and in favor of the classes and against Defendant, as follows:

HAEGGQUIST & ECK, LLP

Case No.: 8:20-cv-00637-DOC-ADS
SECOND AMENDED COMPLAINT

A.   Declare that Defendant violated the PPIA, CLRA, UCL, FAL, and California Health and Safety Code §114087(a);

B.   Order an award of injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Conagra to engage in a corrective advertising campaign or reformulate its products in ways that meet consumer expectations for "natural" and having no preservatives, artificial colors or flavors;

C.   Order Defendant to pay restitution to Plaintiff and the Class;

D.   An award to Plaintiff and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

E.   Order Defendant to pay attorneys' fees and litigation costs to Plaintiff pursuant to California Code of Civil Procedure §§1780(e), 1021.5 and the common-law private-attorney-general doctrine;

F.   Order Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

G.   Order such other and further relief as may be just and proper.

Dated: September 5, 2023

HAEGGQUIST & ECK, LLP
AMBER L. ECK (177882)
ALREEN HAEGGQUIST (221858)
AARON M. OLSEN (259923)

By:  /s/ Aaron M. Olsen

AARON M. OLSEN
225 Broadway, Suite 2050
San Diego, CA 92101
Telephone: (619) 342-8000
Facsimile: (619) 342-7878
ambere@haelaw.com
alreenh@haelaw.com
aarono@haelaw.com

HAEGGQUIST & ECK, LLP

Dated:  September 5, 2023

ELSNER LAW & POLICY LLC
GRETCHEN ELSNER *(Pro Hac Vice)*

By:              /s/ Gretchen Elsner
GRETCHEN ELSNER
314 South Guadalupe Street
Santa Fe, NM 87501
Telephone: (505) 303-0980
gretchen@elsnerlaw.org

Dated:  September 5, 2023

GLANCY PRONGAY & MURRAY LLP
LIONEL Z. GLANCY (134180)
MARC L. GODINO (182689)

By:              /s/ Marc L. Godino
MARC L. GODINO
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
lglancy@glancylaw.com
mgodino@glancylaw.com
info@glancylaw.com

Dated:  September 5, 2023

GLANCY PRONGAY & MURRAY LLP
DAVID J. STONE (208961)

By:              /s/ David J. Stone
DAVID J. STONE
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
dstone@glancylaw.com

Attorneys for Plaintiff and the Proposed
Class

HAEGGQUIST & ECK, LLP